## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BROTHERHOOD MUTUAL          :
INSURANCE COMPANY,          :
                            :
        Plaintiff,          :        CIVIL ACTION
                            :
    v.                      :
                            :        NO. 10-CV-7072
SALEM BAPTIST CHURCH        :
OF JENKINTOWN, <u>et al.</u>,      :
                            :
        Defendants.         :


## DECISION

JOYNER, J.                                    November 1, 2013


    This Declaratory Judgment action was tried non-jury before
the undersigned on July 8, 2013.  The parties have submitted
their proposed factual findings and legal conclusions and the
matter is now ripe for adjudication.  Having carefully considered
all of the evidence, we now make the following:

### FINDINGS OF FACT

    1.  Plaintiff Brotherhood Mutual Insurance Company is an
insurance company duly authorized by the Insurance Commissioner
of Pennsylvania to issue insurance policies in the Commonwealth
of Pennsylvania and has its principal place of business at 6400
Brotherhood Way, Fort Wayne Indiana, 46825.  (Pl's Amended
Complaint; Defendant's Answer thereto, ¶ 1).

    2.  Defendant, Salem Baptist Church of Jenkintown (hereafter
"Salem"), is a Pennsylvania non-profit corporation with its

principal place of business at 610 Summit Avenue, Jenkintown, Pennsylvania, 19046. (Pl's Am. Compl.; Def's Ans., ¶ 2).

3. In the fall of 2008, at the behest of Terri White, then-chairperson of its Board of Trustees, Salem undertook to compare various other insurance plans to the commercial general liability insurance policy under which the church was then insured by Church Mutual Insurance Company. This comparison was undertaken with the goal of securing the best possible insurance option that was most cost effective and not as the result of any dis-satisfaction on Salem's part with Church Mutual's services or policy. (Tr. Ex. 18, p. 16, 39-40, 44-45).

4. Brandon Bower, an account executive and sales representative for the James O. Bower Insurance Agency, met with Terri White at the Salem Baptist Church on or about October 2, 2008. (N.T. 7/8/13, p.7-8). This meeting between Mr. Bower and Ms. White had been arranged by Brotherhood Mutual Insurance Company's marketing department as a result of a "cold call" by a Brotherhood salesperson to Salem. (N.T., p. 6).

5. During this meeting, Mr. Bower examined Salem's premises and obtained much of the information he would need to complete an application for coverage. Most, but not all, of this information was provided by Ms. White. (N.T. 7).

6. Because there was some information about the buildings that Ms. White didn't have at that time, Mr. Bower followed up

with several telephone conversations and a second visit to the church several weeks later. (N.T. 8). Thereafter, on December 9, 2008, Mr. Bower again returned to the church and gave a formal proposal to some six representatives of the church board or leadership. In conjunction with or immediately following this presentation, Mr. Bower prepared a formal application on behalf of Salem for an insurance policy with Plaintiff Brotherhood. (N.T. 8-10; Tr. Ex. 2).

7. Among the questions on the application for insurance were the following inquiries on page 5:

"Has your organization or its leaders (in connection with your organization) been a party to any lawsuit during the past five years?"

Are you aware of any past or present situation or dispute that could result in a claim or lawsuit being made against your organization or its leaders?

(Tr. Ex. 2, p. 5; N.T., 10).

8. In his preparation of the Brotherhood application, Mr. Bower asked Ms. White to answer both of these questions. Ms. White's response to both of these inquiries was "no." (Tr. Ex. 2, p. 5; Tr. Ex. 18, 78-79; N.T. 10-11).

9. At the time that Salem was exploring its insurance options, Ms. White knew that the church was involved in a dispute over the construction of its Family Life Center buildings with Delta Organization, the general contractor for the job and that Delta claimed that Salem owed it monies. (Tr. Ex. 18, 68-69;

N.T. 12).

10.  This dispute, which was in the nature of an arbitration action before the American Arbitration Association, had been commenced by Delta against Salem on July 30, 2007 pursuant to the dispute resolution provision in the contract between those parties.  Specifically, Delta was seeking damages ostensibly resulting from Salem's non-payment of the significant additional expenses incurred by Delta as the result of having to maintain a presence on Salem's construction site for some 9 more months than originally agreed to and for Salem's termination of the parties' contract without prior notice or opportunity to cure.  (Complaint in <u>Logan and Delta Alliance, LLC v. Salem Baptist Church of Jenkintown, et. al.</u>, Civ. A. No. 10-0144, at ¶s 36-42).

11.  Plaintiff issued General Liability Policy No. 37M5A0381574 to and for Defendant which was first effective on January 1, 2009 and had a policy period of three years, until January 1, 2012.  (Pl's Am. Compl.; Def's Ans., ¶s 1, 7; Tr. Ex. 1).

12. Included in this policy were certain "Church Organization Additional Coverages."  (N.T. 43; Tr. Ex. 1, BMIC0122).  Under this sub-heading, the policy read as follows in relevant part:

**PERSONAL INJURY LIABILITY COVERAGE**

**We** pay all sums that **you, your leaders, your** employees or **your appointed persons** become legally obligated to pay as

4

**damages** due to **personal injury** to which this coverage applies.  The event or events causing the **personal injury**:

    a.   must arise out of the religious or not-for-profit operations of **your** organization; and

    b.   must take place in the **coverage territory** during the **policy period.**

This Additional Coverage will apply to **personal injury** resulting from electronic data transmissions (such as E-mail) and from the posting of information on an electronic communication network (such as the internet), provided that claim for such injury is brought in the **basic territory.**

The Personal injury coverage of this endorsement does not apply, however, if the **personal injury** arises out of:

    1.   the oral or written publication of material done by or at the direction of **you, your leader** or **your** employee if **you, your leader** or **your** employee publishes the material knowing that it is false; or

    2.   The publication of information through any advertising, publishing, broadcasting or telecasting operation or facility which is owned or operated by **you.**

13.   The term "personal injury" is defined elsewhere in the

policy:

    **Personal injury** means injury arising out of one or more of the following offenses:

    a.   oral or written publication of material that slanders or libels a person or entity; that disparages a person's or entity's goods, products, or services; or that violates a person's right of privacy; or

    b.   malicious prosecution or false arrest, detention, or imprisonment of a person; or

    c.   wrongful entry into, wrongful eviction from, or invasion of the right of private occupancy of a

premises occupied by a person, but only if such
offense is committed by or on behalf of the owner,
landlord or lessor of the premises; or

d.   infringement of copyright, slogan, trademark, or
trade name; or

e.   unauthorized reproduction, display, or other use
of music, hymns, commentaries, study aids or other
similar material in the course of **your** operations.

But **personal injury** does not include **bodily injury,
property damage, emotional injury** or **financial damage**
of any kind; nor any injury arising directly or
indirectly out of or in connection with any **sexual act,
counseling act,** or **discriminatory act.**

(N.T. 43-44; Tr. Ex. 1, BMIC 0207).

14.   The policy, however, also states the following in

pertinent part under the title **"EXCLUSIONS":**

Each of the exclusions set forth in the Exclusions section
of the Commercial Liability Coverage Form (GL-100) and the
Liability and Medical Coverage Form (BGL-11) apply to each
of the Additional Coverages provided by this endorsement,
unless otherwise modified herein. The following exclusions
apply to the Additional Coverages of this endorsement.

1.   Exclusion 1 of the Exclusions That Apply to Bodily
Injury and Property Damage section of the Commercial
Liability Coverage form (GL-100) is modified as
follows:

**We** do not pay for **loss** of any kind:

a.   that is expected by, directed by, or intended
by any **insured** or by any **covered person;** or

b.   that is the result of any willful, wanton or
malicious act of any **insured** or any **covered
person.**

But Exclusion 1.a. above does not apply to **bodily injury**
that arises out of the reasonable use of force to protect
people or property, or to **bodily injury** or **emotional injury**

> sustained by a child in **your** care as the result of
> reasonable disciplinary action directed toward the student
> by a **covered person** authorized to undertake such
> disciplinary action as part of **your nursery/child care
> operations**.

(Tr. Ex. 1, BMIC 0125).

15.   In its response to Delta's arbitration complaint, Salem asserted a counterclaim against Delta for breach of contract and fraud asserting that Delta had not paid its subcontractors for the work performed on the Salem project but had instead misappropriated Salem's payments.  (Am. Compl. in <u>Logan v. Salem Baptist Church</u>, Civ. A. No. 10-0144, at ¶ 43).

16.  Salem retained the law firm of Eastburn and Gray and one of its partners, Jane Leopold-Leventhal, to represent it in the Arbitration.  (Am. Compl., Civ. A. No. 10-0144, at ¶ 51.) Thereafter, in or around the summer of 2008, it is alleged that Ms. Leopold-Leventhal, together with various other members of Salem's "steering committee," many of whom were purportedly politically influential in Montgomery County[1], met with Montgomery County Detective Mary Anders to accuse Delta of criminal fraud and misappropriation of funds in an attempt to

---

[1]

  More particularly, Logan alleged that Oscar P. Vance, Jr. the Chief County Detective for Montgomery County, and Garrett D. Page, who was then the Montgomery County Treasurer and is now a Judge on the Montgomery County Court of Common Pleas, were active members of the Salem Baptist Church.

7

gain the upper hand in the contractual dispute.[2]  (Am. Compl.,
Civ. A. No. 10-0144, ¶s 52-53; Compl., <u>Mack v. Salem Baptist
Church, et. al.</u>, Civ. A. No. 10-CV-5536, ¶s 2, 6-12).

17.  As a consequence of Salem's accusations, on or about
January 13, 2009, Walter Logan and Lester Mack were arrested,
charged with, *inter alia,* theft and deception and in the case of
Mr. Mack, incarcerated for a period of one year.  (Mack
Complaint, Civ. A. No. 10-5536, at ¶s 13-14; Logan Am. Compl.,
Civ. A. No. 10-0144, at ¶s 55, 60-68).

18.  In addition to having criminal charges filed against
them, Mr. Logan and Mr. Mack were the subject of numerous
newspaper, television and other reports such that their personal
and professional reputations and Mr. Logan's and Delta's business
were damaged.  (Logan Am. Compl., Civ. A. No. 10-0144, at ¶s 68-
77).

19.  In March and April, 2009, while the criminal charges
were pending, Salem and Delta presented their claims before a
neutral AAA arbitrator during two weeks of hearings.  (Logan Am.
Compl., Civ. A. No. 10-0144, at ¶ 92).  At the conclusion of
those hearings, on May 19, 2009, the Arbitrator issued an 18-page
award in favor of Delta and against Salem, finding Salem - not
Delta, to be in breach of their agreement and finding Salem's

---

[2]  In addition to accusing Delta, Salem and Leopold-Leventhal levied
the same accusations against Walter Logan, Delta's President and Lester Mack,
who was Delta's project manager on the Salem job.

8

claims of fraud against Delta to be meritless.  In full settlement of all claims and counterclaims[3] submitted, the Arbitrator decreed that the church pay the sum of $152,530.00 to Delta, together with a penalty on part of the award, counsel fees and expenses.  (See, e.g., Walter Logan's Response to Salem Baptist Church's Motion for Summary Judgment, Appendix 19, at pp. PA1-000690-000707) in Civ. A. No. 10-0144; Am. Compl., Civ. A. No. 10-0144, ¶s 93-99 and Exhibit "K"; Compl., Civ. A. No. 10-5536, ¶ 15).

20.  The Arbitration Award was subsequently confirmed by the Court of Common Pleas of Montgomery County and judgment was entered in favor of Delta and against Salem.  (Am. Compl., Civ. A. No. 10-0144, ¶100 and Exhibit "L"; Compl., Civ. A. No. 10-5536, ¶ 16).

21.  On January 6, 2010, the criminal charges against Mr. Logan and Mr. Mack were dismissed by the Montgomery County District Attorney's office.  (Am. Compl., Civ. A. No. 10-0144, ¶ 102 and Exhibit "M"; Compl., Civ. A. No. 10-5536, ¶ 40).

22.  On January 12, 2010, Walter Logan and Delta[4] filed suit

---

[3]  Salem had counterclaimed against Delta for breach of contract and fraud, which claims were "dismissed and denied" by the Arbitrator.  (See, Arbitration Award at p. 16).

[4]  In this Court's Memorandum and Order entered on August 23, 2013, summary judgment was entered in favor of Salem and against The Delta Alliance on all of Delta's claims against Salem in Logan v. Salem Baptist Church, et. al., Civ. A. No. 10-CV-0144.  We note that while The Delta Alliance appears to be related to, it is not the same entity as that which was the General Contractor on the Salem construction project – the Delta Organization.

against Salem Baptist Church, Eastburn and Gray, Jane Leopold-Leventhal, Marc D. Jonas (another member of the Eastburn and Gray law firm), Mary Anders, Risa Vetri Ferman, the Montgomery County Office of the District Attorney and Montgomery County pursuant to 42 U.S.C. § 1983 and Pennsylvania common law for Unlawful Arrest, Defamation, False Public Statements, Malicious Prosecution, Malicious Abuse of Process, Civil Conspiracy, False Light Invasion of Privacy, Commercial Disparagement, Negligence and for violation of Pennsylvania's Dragonetti Act, 42 Pa. C. S. § 8351. (Compl., Civ. A. No. 10-0144). On October 20, 2010, Lester Mack filed suit against the same defendants for the same causes of action. (Compl., Civ. A. No. 10-5536).

23. On December 6, 2010, Plaintiff commenced this action against Defendant Salem Baptist Church seeking a Declaratory Judgment that it had no duty to further defend or indemnify the church in the actions commenced against it by Logan, Delta and Mack.

24. Although Plaintiff could have terminated Salem's policy on the policy's anniversary dates – January 1, 2010, January 1, 2011, and January 1, 2012, it did not do so, despite both the claims and underwriting departments having knowledge in April/May of 2010 that Messrs. Mack and Logan and Delta had filed suit against Salem for malicious prosecution and other related claims. As a result, the policy remained in full force and effect through

10

2012. (N.T. 59-63).

## DISCUSSION

Typically, the interpretation of an insurance contract is a
question of law that is properly decided by the court. <u>Reliance
Insurance Co. v. Moessner</u>, 121 F.3d 895, 900 (3d Cir.
1997)(citing <u>Standard Venetian Blind Co. v. American Empire Ins.
Co.</u>, 503 Pa. 300, 304-05, 469 A.2d 563, 566 (1983)).  To
establish insurance coverage, the insured bears the initial
burden of showing that the harm described in the plaintiff's
complaint potentially falls within the scope of the policy.
<u>Devcon International Corp. v. Reliance Insurance Co.</u>, 609 F.3d
214, 218 (3d Cir. 2010).  "An insurer's duty to defend an action
against the insured is measured, in the first instance, by the
allegations in the plaintiff's pleadings.  In determining the
duty to defend, the complaint claiming damages must be compared
to the policy and a determination made as to whether, if the
allegations are sustained, the insurer would be required to pay
the resulting judgment..."  <u>State Farm Fire & Casualty Co. v.
Estate of Mehlman</u>, 589 F.3d 105, 110 (3d Cir. 2009)(quoting
<u>Donegal Mutual Insurance Co. v. Baumhammers</u>, 595 Pa. 147, 938
A.2d 286, 290 (2007) and <u>Gene's Restaurant, Inc. v. Nationwide
Insurance Co.</u>, 519 Pa. 306, 548 A.2d 246, 247 (1988)).  Stated
otherwise, "if the complaint avers facts that *might support
recovery* under the Policy, coverage is triggered and the insurer

11

has a duty to defend." _Regent Insurance Co. v. Strausser Enterprises_, 902 F. Supp. 2d 628, 636 (E.D. Pa. 2012)(emphasis in original, quoting _Sikirica v. Nationwide Insurance Co._, 416 F.3d 214, 225-26 (3d Cir. 2005)).  It should be noted that the duty to defend is broader than the duty to indemnify – if an insurer is found to not have a duty to defend, it also will have no duty to indemnify.  _Travelers Property Casualty Co. Of America v. Chubb Custom Insurance Co._, 864 F. Supp. 2d 301, 313, n. 13 (E.D. Pa. 2012)(citing _Kvaerner Metals Div. Of Kvaerner U.S., Inc. v. Commercial Union Insurance Co._, 589 Pa. 317, 908 A.2d 888, 896 (2006)).  And, the duty to indemnify only arises if the damages the insured must pay are actually within the policy coverage; hence, there may be a duty to defend without a duty to indemnify.  _Frog, Switch & Manufacturing Co. v. Travelers Insurance Co._, 193 F.3d 742, 746 (3d Cir. 1999).

Once a showing has been made that a claim falls potentially within the scope of a policy's coverage, the burden then shifts to the insurer to demonstrate that an exclusion places the particular harm outside of the Policy's reach.  _Regent Insurance v. Strausser_, _supra_, (citing _Estate of Mehlman_, 589 F.3d at 111).  Policy exclusions are strictly construed against the insurer.  _London v. PA Childcare, LLC_, Civ. A. No. 3:09-CV-2256, 2012 U.S. Dist. LEXIS 36987 at *8 (M.D. Pa. Mar. 19, 2012)(citing _Selko v. Home Insurance Co._, 139 F.3d 146, 152 n. 3 (3d Cir. 1998) and

Standard Venetian Blind, 469 A.2d at 566).

Obviously in performing the foregoing analyses, the court must evaluate the terms of the policy to determine whether they are ambiguous. Devcon, 609 F. 3d at 218 (citing Lucker Mfg. v. Home Insurance Co., 23 F.3d 808, 814 (3d Cir. 1994). If the terms of the policy are clear and unambiguous when read in their entirety, the rule in Pennsylvania is to give effect to the plain language of the agreement. Moessner, 121 F.3d at 901; London, supra. An ambiguity is said to exist if there is more than one reasonable interpretation of the term or "if reasonably intelligent people considering the term in the context of the entire policy would honestly differ as to its meaning." Devcon, 609 F.3d at 218; Coregis Insurance Co. v. City of Harrisburg, Civ. A. No. 1:03-CV-920, 2006 U.S. Dist. LEXIS 20340 at *16 (M.D. Pa. Mar. 30, 2006). If the court identifies an ambiguity in the policy, the court must resolve the ambiguity by giving effect to the interpretation of the term that is most favorable to the insured, as the non-drafting party. Regent v. Strausser, 902 F. Supp. 2d at 636 (citing Devcon, 609 F.3d at 218 and J.C. Penney Life Insurance Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004)). In so doing, the court must construe words of common usage in their natural, plain, and ordinary sense and may inform its understanding of those terms by considering their dictionary definition. Sunshine v. Reassure Am. Life Insurance Co., Civ. A.

No. 10-CV-1030, 2012 U.S. Dist. LEXIS 30441 at *14 (E.D. Pa. Mar. 6, 2012)(citing Madison Constr. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 735 A.2d 100, 108 (Pa. 1999)). Nevertheless, a court should be careful not to create an ambiguity and should likewise avoid rewriting the policy language in such a way that it conflicts with the plain meaning of the language. Lucker Manufacturing v. Home Insurance Co., 23 F.3d 808, 814 (3d Cir. 1994). *See Also*, Jacobs Constructors, Inc. v. NPS energy Services, 264 F.3d 365, 376 (3d Cir. 2001)("However, the court should read the policy to avoid ambiguities and not torture the language so as to create them").

In this case of course, it is Plaintiff's position that the policy which it issued to Defendant clearly and unambiguously does not provide coverage for and/or excludes the claims which Delta, Logan and Mack filed against it.  In the alternative, Plaintiff contends that the incident which forms the basis for the claims in the underlying Logan and Mack actions occurred prior to the policy's effective date such that it is not a covered loss.  Finally, Plaintiff asserts that it is entitled to rescission of the Policy because Ms. White affirmatively mis-represented that there were no claims against either the defendant church or any of its leaders in the application for insurance.

Turning first to the clarity of the insurance contract at

14

issue in this case and contrary to Plaintiff's argument, we find that a patent ambiguity exists on the face of the Policy as a result of the contradiction between the relevant clauses - the first providing personal injury liability coverage for the Church, its leaders, employees and appointed persons under the "Church Organization Additional Coverages" addendum, and the second under the "Exclusions" provision.

Indeed, reading the Additional Coverages addendum *in pari materia* with the definition of "personal injury," the policy clearly and specifically states that there is coverage for "all sums that you, your leaders, your employees or your appointed persons become legally obligated to pay as damages due to personal injury ... arising out of one or more of the following offenses: ... malicious prosecution or false arrest, detention, or imprisonment of a person. ..."  Exclusion 1, however, states that Brotherhood does not pay for any kind of loss "that is expected by, directed by, or intended by any insured or by any covered person[,] or that is the result of any willful, wanton, or malicious act of any insured or any covered person."

The dictionary definition[5] of "malicious" is "[r]esulting from, inclined to, or marked by malice."  "Malice," in turn, is defined as "1. A desire to harm others or to see others suffer.

———————————

    [5]   See, e.g., WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 720 (3d ed. 1994).

2. *Law*. Intent, without just cause or reason, to commit an

unlawful act injurious to another or others."  And, "malicious

prosecution" is: "[o]ne begun in malice without probable cause to

believe the charges can be sustained.  An action for damages

brought by person, against whom civil suit or criminal

prosecution has been instituted maliciously and without probable

cause, after termination of prosecution of such suit in favor of

person claiming damages."  BLACK'S LAW DICTIONARY 958 (6th ed.

1991)[6].  As our colleague Judge Gardner so cogently observed in

<u>Regent Insurance  v. Strausser</u>, 902 F. Supp. 2d at 641, a similar

case involving nearly identical policy language,

> If malicious prosecution requires proof of an improper
> motive or actual malice and, as such, all malicious
> prosecution claims under Pennsylvania law would fall within
> the "Knowing Violation" exclusion, then Regent has
> effectively also promised never to defend ... against a
> malicious prosecution claim under Pennsylvania law.  The
> Policy is ambiguous regarding coverage for malicious
> prosecution because a person of reasonable intelligence who
> read Coverage B, the "Knowing Violation" exclusion, and the
> definition of "personal and advertising injury" could
> reasonably conclude that (a) the Policy never covers
> malicious prosecution, or (b) the Policy always covers
> malicious prosecution."

In this same fashion, we too find the policy at issue here to be

confusing and ambiguous with respect to coverage of the precise

---

[6]  This is in keeping with Pennsylvania law given that malicious
prosecution under Pennsylvania common law requires four elements: (1) the
institution of legal proceedings against the plaintiff, (2) without probable
cause, (3) with malice, and (4) the proceedings terminated in favor of the
plaintiff.  <u>Clifton v. Borough of Eddystone</u>, 824 F. Supp. 2d 617, 634 (E.D.
Pa. 2011)(citing <u>Manley v. Fitzgerald</u>, 997 A.2d 1235, 1241 (Pa. Commw. Ct.
2010)).

claims asserted by Messrs. Logan and Mack against Salem in the underlying actions.

This confusion is in no way obviated by the testimony presented by Brotherhood's Senior Regional Underwriting Manager, Richard Phillips.  According to Mr. Phillips, the foregoing provisions are clear in that they provide coverage only for claims such as might be filed against a church nursery or youth ministry worker wrongfully accused of striking a child and who, as a result of having criminal charges filed against them, suffered humiliation or other personal or emotional injury.  In that event, Mr. Phillips testified, the policy would provide coverage for the emotional, etc. damages suffered by the wrongfully accused church worker.  (N.T. 45-47).  However, as was pointed out on cross-examination at trial, the malicious prosecution claim in Mr. Phillips' scenario would be a claim belonging to and presumably made by the church's nursery or youth ministry worker against a third party parent, guardian or law enforcement agent; a malicious prosecution claim would and could not lie against the insured church under those facts.  (N.T. 51-58).  Further, it appears as though Mr. Phillips' construction is directly refuted by the following language located directly below the Personal Injury Liability Coverage section of the Church Organization Additional Coverages portion of the Policy:

**<u>MEMBERSHIP EMOTIONAL INJURY LIABILITY COVERAGE -</u>**

**We** pay all sums that **you** or **your leader** become legally obligated to pay as **damages** due to **emotional injury** to which this coverage applies.  The event or events causing the **emotional injury:**

a.   must arise out of **your** organization's policy, practice or procedure with respect to attendance or membership in the organization; and

b.   must take place in the **coverage territory** during the **policy period**.

This Additional Coverage does not apply, however, if:

1.   the **emotional injury** arises out of any **discriminatory act, sexual act** or **counseling act**; or

2.   the **emotional injury** arises out of the actual, threatened or alleged touching of, or use of physical force against, one or more persons by another person; or

3.   the **emotional injury** is sustained by **your leader** or **your employee**.

(Tr. Ex. 1, BMIC 0122-0123, emphasis in original).

Thus Mr. Phillips' interpretation is, we find, wholly inconsistent with the plain language of the policy and we decline to adopt it.  Accordingly, given that we are constrained to resolve the insurance contract's ambiguity by giving effect to the interpretation of the term that is most favorable to the insured, as the non-drafting party, we conclude that the Policy affords coverage to Salem Baptist Church, its leaders, employees and appointed persons for all of the remaining claims asserted against them in the underlying <u>Logan</u> and <u>Mack</u> actions.

We also cannot agree with Plaintiff's contention that coverage does not exist for Logan and Mack's claims against Salem

18

because the actions complained of occurred before the policy's effective date. Although it appears that the Pennsylvania Supreme Court has yet to issue a definitive decision on the point, the Third Circuit has predicted that it would and will find that the tort of malicious prosecution arises or "occurs" for insurance coverage purposes when the underlying criminal charges are filed. City of Erie, PA v. Guaranty National Insurance Co., 109 F.3d 156, 160 (3d Cir. 1997); Coregis v. Harrisburg, 2006 U.S. Dist. LEXIS at *15. Here, the Policy went into effect on January 1, 2009 and the criminal charges against Mr. Logan and Mr. Mack were filed on January 13, 2009. Accordingly, the claims arose after the Policy's effective date and are covered[7].

We next consider and address Brotherhood's assertion that Terri White's failure to disclose the church's involvement in arbitration proceedings with Logan and Delta on the insurance application constituted a material omission rendering the policy void and entitling Plaintiff to rescission of the policy.

"Generally, in order to void an insurance policy under Pennsylvania law, an insurer has the burden of proving, by clear and convincing evidence, the following three factors: (1) the

_____

[7] Although the parties appear to only argue that the malicious prosecution claim falls outside the scope of the policy in their Proposed Findings of Fact and Conclusions of Law, given that there is record evidence in the underlying actions that the civil conspiracy was ongoing and continued past the policy's effective date and that the Salem defendants continued to press the criminal proceedings even after the arbitrator's ruling, we likewise find those claims to fall within the ambit of the Brotherhood policy.

insured made a false representation; (2) the insured knew the representation was false when it was made or the insured made the representation in bad faith; and (3) the representation was material to the risk being insured." Northwestern Mutual Life Insurance Co. v. Babayan, 430 F.3d 121, 129 (3d Cir. 2005)(citing Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004)). *See also*, Sadel v. Berkshire Life Insurance Co. of America, No. 11-1350, 473 Fed. Appx. 152, 156, 2012 U.S. App. LEXIS 6455, *9 (3d Cir. Mar. 30, 2012))(same). "A misrepresented fact is material if being disclosed to the insurer it would have caused it to refuse the risk altogether or to demand a higher premium." Nationwide Mutual Insurance Co. v. Starlight Ballroom Dance Club, Inc., No. 05-1031, 175 Fed. Appx. 519, 522 (3d Cir. Mar. 14, 2006)(quoting New York Life Insurance Co. v. Johnson, 923 F.2d 279, 281 (3d Cir. 1991)). "Bad faith" is said to occur if an action was undertaken for "the purposes of fraud, dishonesty or corruption." Thunberg v. Stause, 545 Pa. 607, 616, 682 A.2d 295, 299 (1996)(citing Frick v. McClelland, 384 Pa. 597, 600, 122 A.2d 43 (1956)); S.B. v. United of Omaha Life Insurance Co., Civ. A. No. 13-1463, 2013 U.S. Dist. LEXIS 83642 at *14 (E.D. Pa. June 13, 2013).

However, under general contract principles, a material misrepresentation renders a contract voidable - not void. In re Estate of Long, 419 Pa. Super. 389, 615 A.2d 421, 422

(1992)(citing <u>Germantown Manufacturing Co. v. Rawlinson</u>, 341 Pa. Super. 42, 491 A.2d 138 (1985)).  And, a party to a voidable contract may lose his right to rescind or avoid the contract if he fails to disaffirm or demonstrates an intention to affirm. <u>Id</u>. Indeed, "in order for a party to have a right to rescission, 'it is his duty to act promptly, and if he elects to rescind, to notify the other party within a reasonable time so that the rescission may be accomplished at a time when the parties may still be restored as nearly as possible, to their original positions.'" <u>Schwartz v. Rockey</u>, 593 Pa. 536, 543, 932 A.2d 885, 889 (2007)(quoting <u>Galati v. Ptamkin Chevrolet Co.</u>, 198 Pa. Super. 533, 537, 181 A.2d 900, 902 (1962)).

In this case, we agree with Plaintiff that Ms. White knowingly misrepresented a material fact when she gave a negative response to the application's question regarding awareness of any past or present situation or dispute that could result in a claim or lawsuit being made against the church or its leaders.  Ms. White admitted that she knew the church was involved in a dispute with Delta when she was interviewed by Mr. Bower, and Mr. Phillips testified that had the plaintiff's underwriting department known of this dispute, it would not have written the policy.  (N.T., 48-49; Tr. Ex. 18, 67-69).  Hence, the policy at issue was clearly voidable on the basis of these facts.

Brotherhood, however, did not act to rescind the policy

within a reasonable period.  Instead, despite obtaining knowledge in April or May of 2010 that Delta, Logan, and Mack had filed claims against Salem, and even though "Brotherhood could have walked away from the risk at that point," Plaintiff reviewed and renewed the policy through 2012.  (N.T. 59-63).  In so doing, Plaintiff demonstrated its intention to affirm the insurance policy which it had issued to Salem in December, 2008 and lost any rights which it may have had to avoid or rescind the policy in this declaratory judgment action.  As a result, we conclude that there is coverage under the policy and Brotherhood has the duty to defend and if appropriate, indemnify Salem, its leaders, employees and/or its appointed persons in the underlying <u>Logan</u> and <u>Mack</u> lawsuits.  Accordingly, we now enter the following:

### CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the parties and the subject matter of this civil action pursuant to 28 U.S.C. §1332 and 28 U.S.C. §2201.

2.  Brotherhood's General Liability Policy No. 37M5A0381574 issued to and for Salem Baptist Church of Jenkintown and which was first effective on January 1, 2009 affords coverage to Salem Baptist Church and those of its leaders, employees and/or appointed persons who have been joined as defendants in the cases of <u>Logan v. Salem Baptist Church of Jenkintown, et. al.</u>, Civ. A. No. 10-0144 and <u>Mack v. Salem Baptist Church, et. al.</u>, Civ. A.

No. 10-CV-5536, both of which are presently pending in this court, the United States District Court for the Eastern District of Pennsylvania.

3.   Inasmuch as there is coverage for Salem Baptist Church of Jenkintown, its leaders, employees and/or appointed persons under the Brotherhood Policy, Brotherhood has the duty to defend and, if appropriate, to indemnify the same for any and all damages which may be awarded in either or both of those civil actions up to the limits of liability established under the said policy.

An Order of Judgment follows.